## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 24-00072-02 (RBW)** |
| | ) | |
| **BRYAN DULA** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT BRYAN DULA'S MEMORANDUM IN AID OF SENTENCING

### I.    Introduction

Mr. Dula will be before the Court for sentencing after having accepted responsibility and pleaded guilty for his actions at the Capitol building on January 6, 2021, in violation of two petty misdemeanors, 40 U.S.C. § 5104(e)(2)(D) and (G). He is remorseful for his actions, deeply regrets his conduct, and is prepared to accept responsibility for those actions.

Mr. Dula respectfully requests that the Court impose a probationary sentence with appropriate conditions, along with the $500 restitution obligation. Such a sentence is sufficient but not greater than necessary to meet the goals of sentencing, as required by 18 U.S.C. § 3553(a).

### II.    Procedural History

On September 26, 2022, Mr. Dula and his wife/co-defendant voluntarily and without counsel met with two FBI Agents at a Starbucks near their home in

Lockport, Illinois where they were interviewed regarding their actions at the U.S. Capitol on January 6th, 2021. During the interview, they answered questions openly and honestly, they never denied entering the U.S. Capitol building, and they provided additional details about what they did and what they witnessed. More than 16 months later, on February 1, 2024, Mr. Dula and his wife were arrested at their home in Lockport, Illinois, pursuant to a criminal complaint charging them with misdemeanors in violation of 18 U.S.C. § 1752 (a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). They appeared via video for their initial appearance in Magistrate Court on February 13, 2024. The government did not seek pretrial detention. They were released on conditions and have fully complied with those conditions for approximately 7 months.

Very early on in the case, both Mr. Dula and Ms. Fontaine expressed a desire to accept responsibility and enter a guilty plea. On June 10, 2024, they both entered a guilty plea to Counts three and four of the criminal information charging them with violations of 40 U.S.C. § 5104(e)(2)(D) and (G). They have continued to be in full compliance with all conditions of release. They also have fully complied fully with the conditions of their plea agreement, including participating in interviews at the government's convenience before sentencing in which they were fully transparent and continued to accept responsibility for their actions.

### III.    Application of the Sentencing Factors

#### A. Mr. Dula's History and Characteristics Demonstrate that a Probationary Sentence is Appropriate

##### 1.  Background and Family

Bryan Dula, now age 53, was born and raised in Cincinnati, Ohio.  Bryan and his brother grew up in a close-knit, family-oriented home. His mother, who passed away from an arterial blood clot in 2002, worked as an office manager. His father, who passed away from cancer in 2012, worked as an engineer. Bryan was very close with both of his parents, and the loss was significant. Bryan has fond memories of working on cars with his dad in their garage when he was young, and he credits his father for his love of cars and race car driving which is still a hobby of his today.

Bryan has two biological daughters from his first marriage (1998 – 2009). His twin girls, now age 23, are what he considers to be his greatest achievement in life. He was a highly involved father, even after the divorce when he and his ex-wife entered into a 50/50 custody arrangement. Around two years ago, Bryan's daughters abruptly ceased contact with him, for reasons unknown to Bryan.  This has been both heartbreaking and confusing for Bryan and has brought him a great deal of stress and sadness.

Bryan is currently married to his wife and co-defendant, Kelly Fontaine. Bryan and Kelly met in August of 2019 at his brother's 50th birthday party in Chicago.  At the time, Bryan was living in Florida. The two kept in touch and met for dinner a few months later when Kelly was in Florida visiting a friend.  Before long, they were traveling back and forth between Florida and Illinois to visit each

other. Eventually, Kelly began bringing her daughters to Florida. When the girls came to visit, Bryan always had fun excursions planned, such as swimming with dolphins and visiting Disney World. Over the next two years, Kelly and Bryan fell in love. Kelly's daughters adore Bryan and he cares for them as though they were his own. (See attached letter). In the summer of 2022, Bryan moved to Illinois and he and Kelly were married.



### 2. Mr. Dula has a Strong Work Ethic and Commits to Helping Others

Bryan received his high school diploma in 1989 from Lakota High School in Westchester, Ohio. He later moved to Florida and completed 18 months of university study at Everglades University in Florida. He was one semester short of receiving his Associate's degree when he learned that his father had cancer and he dropped out to assist the family. Additionally, Bryan earned a project management certification in carpentry. Over the years, Bryan has worked for various companies in carpentry, project management, and millwork.  He has consistently been

employed his entire adult life, minus a short two-month gap when he relocated from Florida to Illinois in the summer of 2022. Bryan currently works as a project manager at American Designs in Belwood, IL.

Over the years since the 1990s, Bryan has used his carpentry and millwork skills to assist in building affordable homes and improving neighborhood infrastructure for underprivileged families and communities through the non-profit organization Habitat for Humanity. Bryan has also contributed to the Make-A-Wish Foundation by volunteering his time and sharing his love of race car driving to grant wishes for children with critical illnesses by providing the unforgettable experience of riding in a real race car.

### 3. Mr. Dula Has No Criminal History and No Substance Abuse Issues

Bryan has no criminal history. Aside from January 6th, he has been a law abiding, model citizen. He has never used drugs, aside from occasional legal marijuana. He drinks alcohol only socially.  He and his wife have abided by the conditions of their release by removing all marijuana from their home following their arrest and have not used it since.

### B. The Nature and Circumstances of the Offense

Mr. Dula and his wife are not associated with any extremist groups. Mr. Dula heard about the Trump rally though his wife who had heard about it on Facebook. They decided to travel to D.C., both to attend the rally and to visit Ms. Fontaine's cousins who reside in D.C. They planned to attend the rally but did not anticipate

going to the Capitol building, and they certainly never imagined that they'd be illegally entering the building.

When they arrived at the Ellipse for the Trump rally on January 6th, they wore regular civilian clothing. They did not bring weapons of any kind, and they did not carry flags.  While at the rally, they heard Trump encouraging the crowd to walk to the Capitol and they decided to join.  At this point, they still did not anticipate entering the Capitol building.  They viewed the march to the Capitol as an extension of the rally.  They were not part of the initial breaches of Capitol grounds, nor did they arrive early enough to witness the barricades being removed. However, they did enter the building along with the crowd.

Mr. Dula and Ms. Fontaine know that their actions were inexcusable, and they take full responsibility for those actions. They understand the seriousness of their conduct. However, there are considerations that support a non-custodial sentence.

First, they did not condone nor participate in any violence. After arriving on Capitol grounds, Mr. Dula and Ms. Fontaine followed the **cr**owd up the Northwest steps.  They did not go toward the center of the West front and therefore did not witness all of the violence that was occurring there. They did however, witness some people acting unruly and destructive after climbing the stairs and arriving on the Northwest terrace. Neither of them condoned this behavior, and they recall verbally admonishing such behavior. However, they know that was not enough - they know they should have immediately departed the area instead of going into the building.

Mr. Dula and his wife were inside the Capitol building for 11 minutes.  They remained in the hallways only. They never entered, or attempted to enter, any of the adjacent offices or conference rooms which at that time were being flooded by many other protestors through open and unsecured doors. They never traveled, or attempted to travel, to other floors of the building.

They did however, witness some things which went strongly against their beliefs and caused them concern. For example, they saw a man holding an ornate flag which they suspected may have been property of the Capitol and they saw a woman in an altercation with law enforcement. Not wanting to be a part of any of that, they decided to leave the building. They asked an officer how to exit and he directed them to the North door.  They exited peacefully and without incident.

While they recognize that their very presence contributed to the chaos and destruction of that day, neither Mr. Dula nor his wife personally engaged in violent or destructive behavior.  The government may suggest that the lack of violence and destruction of property is not a mitigating factor in misdemeanor cases because, had this conduct been present, they would have been charged with felony offenses. However, this distinction is important because there have been misdemeanor cases where defendants did display assaultive and/or aggressive behavior. Such was not the case here.

When they entered the Capitol building, the door had already been breached and Mr. Dula does not recall seeing officers attempting to stop the entry into the building. Nevertheless, he recognizes that the officers were overwhelmed by the

crowds and had no choice but to stand back. Reflecting on the day, Mr. Dula cannot really describe what he was thinking when they followed the crowd through open doors into the building, only to say, he was not thinking. They certainly did not set out to "storm the capitol" or to interfere with the certification of the vote, although he recognizes that this was the result.

Mr. Dula understands that his mere presence added to a truly disruptive and disorderly day, and that by being a part of the crowd and by illegally entering the U.S. Capitol, he is guilty of the charges he faces. He is ashamed to have played any part in this at all, and is remorseful for his participation, regardless of the level. However, there are a wide range of behaviors that fall under the definition of "disruptive" and "disorderly." Mr. Dula's actions are at the lowest end of that spectrum. And, as this Court is aware, the same misdemeanor charges and plea offers have been given to those who were far more blatantly disruptive and disorderly, participating in behaviors such as yelling obscenities at officers, entering offices or conference rooms, smoking inside the building, littering, pounding on doors, etc.

It is also important to note that after exiting the building, Mr. Dula and Ms. Fontaine immediately began leaving Capitol grounds. They left early and on their own accord. They recall asking an officer for the best way to exit Capitol grounds and were advised to avoid the West side.  They did as they were told, even though it meant taking the long way out, opposite of how they arrived.  They walked around the East side and passed the main steps. At this time, a large crowd was still on the

steps and protestors were indeed still entering the building.  They walked past the crowd that was gathered and was disruptive. At this point, they had no interest in joining that melee.



Mr. Dula and Ms. Fontaine never attempted to climb the steps. They did not attempt to re-enter the building, nor did they remain with the crowd to watch the rest of the day unfold.

They kept walking, made their way through the crowd, ended up at the Northeast corner of the East plaza and then found their way out through the far East side of Capitol grounds. *Images below show defendants leaving the East plaza at 3:20pm and leaving Capitol grounds at 3:23pm.*

 

Of course, Mr. Dula and his wife never should have been there in the first place, but their early departure sets them apart from the many other offenders-most of whom stayed on Capitol grounds much later and some of whom only left when they were forced out by law enforcement after 5pm.

At 3:26pm, while thousands were still clamoring in and around the building, Mr. Dula and Ms. Fontaine were well outside of Capitol grounds, walking away from the chaos.

*Images below show defendants on 1ˢᵗ St, NE, followed by a sampling of CCTV images of the Capitol building – from both the East and West side -  at approximately this same time.*



Having spent a relatively short time on Capitol grounds, Mr. Dula did not

understand the full extent of what had occurred on January 6th until they later

watched footage on the news. He knew of course that what they had done was

wrong, but as he watched the news, he realized the full extent of what had occurred and the gravity of the day. He was shocked and saddened to see what had happened and was immediately ashamed of having been a part of what had occurred. He did not brag about his actions and did not boast about his participation on social media.

Moreover, Mr. Dula and his wife have been honest and cooperative with law enforcement since the beginning. In September of 2022, Mr. Dula and his wife were contacted by the FBI. They voluntarily met with two FBI Agents at a Starbucks near their home. They were honest about their actions and they admitted to entering the Capitol building.  During the interview, the couple requested to turn themselves in, but the request was denied. Understandably anxious about what was to come, they asked when and if they should expect to be arrested. They wanted to ensure that Ms. Fontaine's youngest daughter (who was then only 12 years old) wouldn't be home when the arrest occurred.  The FBI advised that they should expect to be arrested in around two weeks' time. They advised that they'd be sending four agents, two female and two male; and that they would contact the defendants by phone 24 hours in advance.

After that, and indeed up until the day of their arrest, Mr. Dula and his wife lived with anxiety over the inevitable.  Every time their phones rang, they panicked and scrambled to answer the call.  But the call did not come in two weeks.  In fact, the call never came.  Over a year later, on February 1st, 2024, the FBI showed up unannounced with what they recall being a large number of SWAT vehicles and dozens of agents. Mr. Dula recalls that the vehicles lined the entire street and filled

the cul-de-sac. The couple requested that the arrest take place outside so that Ms. Fontaine's young daughter could remain inside the home and be at least somewhat shielded from the event. The agents complied, but this of course meant that Mr. Dula and his wife stood outside in handcuffs for what they recall being over two hours while the neighborhood watched the entire spectacle.  The local news ran an article and TV news story the very same night.

It is not lost on Mr. Dula or his wife that their actions led to this outcome. And they do not suggest that law enforcement acted improperly. But to say that Mr. Dula and Ms. Fontaine have not yet experienced consequences for their actions would be inaccurate. They have suffered the embarrassment of being arrested, something Mr. Dula had never experienced, a loss of reputation in their community and familial disharmony.

### C. A Probation Sentence would be Sufficient to Reflect the Seriousness of the Offense, Provide Just Punishment and Achieve Deterrence

In many other January 6 cases, the government has identified nine relevant sentencing factors:

> While looking at the defendant's individual conduct, we must assess such conduct on a spectrum and with an eye towards its larger consequences. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media;

(8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.[1]

Application of the government's factors show that probation is appropriate for Mr. Dula. As set forth herein and in the PSRs, Mr. Dula and Ms. Fontaine peacefully traveled to Washington, D.C. to participate in a rally hosted by the President. They did not travel with an extremist or military group or bring any weapons. They entered through the doors that had already been breached. They did not engage in violence or destruction. They were inside for 11 minutes and stayed only in areas traditionally open to the public. They did not purposefully delete any photos or videos from their phones. They cooperated fully with law enforcement. They pleaded guilty early and without reservation. They have expressed remorse - both through verbal statements to counsel, and their unwavering decision to plead guilty – and they have shown that they are ready to accept the consequences for

---

[1] See, e.g., *United States v. Buckler*, 1:22-CR-162(TNM), ECF No. 26, Gov. Sentencing Memo at 26 (requesting 30 days of incarceration for defendant who entered the Capitol twice, the first time by climbing through a broken window and who entered a Senator's private office and was captured on video in the office while another individual smoked marijuana). Mr. Buckler was sentenced to probation with a condition of home incarceration. Nearly identical wording and the same list of factors are found in other January 6th Government Sentencing Memorandums, including but not limited to *USA v. Bennett*, 1:21-CR-227-JEB, (ECF 24); *USA v. Grace*, 1:21-CR-492-RDM (ECF 35); *USA v. Dresch*, 1:21-CR-71-ABJ (ECF 33); *USA v. Ehrke*, 1:21-CR-97-PLF (ECF 20); *USA v. Wrigley*, 1:21-CR-42-ABJ (ECF 35); *USA v. Reimler*, 1:21-CR-239-RDM (ECF 31); *USA v. Brodnax,* 1:21-CR-350-PLF (ECF 41); *USA v. Sorvisto*, 1:21-CR-320-ABJ (ECF 28); *USA v. Loftus*, 1:21-CR-81-DLF (ECF 29); *USA v. Juran*, 1:21-CR-419-TFH (ECF 21); *USA v. Camper*, 1:21-CR-325-CKK (ECF 30).

their actions. Of course, the government's proposed factors are just suggestions. However, if the Court accepts the government's invitation to apply these factors, it is clear that these factors, as well as the 3553(a) factors discussed herein, support a sentence of probation.

Having never been in trouble with the law before, the process of being charged with a federal crime has been emotionally overwhelming for Mr. Dula and Ms. Fontaine. After a lifetime of hard work, strict adherence to law, and commitment to family, Mr. Dula and his wife were devastated to be arrested, handcuffed, and led out of their home by agents for the neighborhood to see. The anxiety over the prospect of losing employment and professional credibility, as well as the strain it has put on their personal relationships is more than sufficient to deter them from ever again having a lapse of judgment like they had on January 6. This assertion is supported by U.S. Sentencing Commission Data which found that offenders with zero criminal history points have a rate of reconviction of between 3 and 5 percent.[2] Of course, these numbers likely do not reflect offenders convicted of petty misdemeanors, which further suggests that the chance that Mr. Dula or Ms. Fontaine would ever reoffend is next to nil. Indeed, they have both taken a step back from following political news and have no desire to ever participate in any type of rally or protest again.

With respect to general deterrence, the government's widespread prosecution of nearly everyone who entered the Capitol grounds should serve as a deterrent to

---

[2] See Ruben Castillo et al., Recidivism and the "First Offender" 13 (2004), available at https://www.ussc.gov/research/research-publications/recidivism-and-first-offender.

others in future elections. Research has consistently shown that while the certainty
of being caught and punished has a deterrent effect, "increases in severity of
punishments do not yield significant (if any) marginal deterrent effects."[3] In short,
the most effective deterrent is the certainty of punishment, rather than its length.[4]
One would certainly hope and expect that general deterrence has been met by the
government's dogged pursuit of everyone who participated in the January 6
insurrection.

### D. A Probation Sentence Would Avoid Unwarranted Disparities

#### 1. The Majority of January 6th Misdemeanor Defendants Receive Probationary Sentences

In a District with as many judges as this District has, there can be no
definitive sentence that addresses the unique facts and circumstances of each case.
Sentences imposed in these cases vary from very short terms of probation to periods
of incarceration, and everything in between. While Mr. Dula's and Ms. Fontaine's
conduct was serious, probation remains an appropriate resolution and would not
result in disparity. *See e.g., U.S. v. Jonathan Sanders*, 1-21-CR-384 (CJN) (36
months' probation); *United States v. Jackson Kostolsky*, 21-cr-197 (DLF) (36 months'
probation with home confinement*); U.S. v. Jennifer Parks*, 1:21-CR-363 (CJN) (24
months' probation); *United States v. Brian Sizer*, 1-21-CR-621 (CRC) (12 months'

---

[3] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 28 (2006),
available at https://scholarship.law.umn.edu/faculty_articles/495 .
[4] See, e.g., The Growth of Incarceration in the United States 131 (Jeremy Travis et
al. eds., 2014); Five Things About Deterrence, Nat'l Inst. of Just.,
https://nij.ojp.gov/topics/articles/five-things-about-deterrence

probation); *United States v. Gary Edwards,* 1:21-CR-366 (JEB) (12 months'
probation); *U.S. v. Jordan Hernandez*, 21-CR-272 (TJK), (24 months' probation);
*United States v. Anna Morgan Lloyd*, 21-cr-164 (RCL) (36 months probation);
*United States v. Jessica and Joshua Bustle*, 21-Cr-238 (TFH) (probation with home
confinement); *United States v. Andrew Bennett*, Crim. No. 21-227 (JEB) (probation
with home confinement imposed); *United States v. Danielle Doyle*, 21-cr-0234 (TNM)
(2 months probation with fine imposed); *United States v. Valerie Ehrke*, 21-cr-97
(PLF) (36 months probation); *United States v. Eliel Rosa*, 21-cr-068 (TNM) (12
months probation); *United States v. Jacob Hiles*, 21-cr-155 (ABJ) (2 years
probation); *United States v. Sean Cordon*, 21-cr-269 (TNM) (2 months probation);
*United States v. John Wilkerson, IV*, Crim. No. 21-302 (CRC)(3 years probation);
*United States v. Andrew Wrigley*, Crim. No. 21-042 (ABJ) (18 months probation);
*United States v. Andrew Hatley*, Crim. No. 21-098 (TFH) (3 years probation); *United
States v. Rachael Pert*, Crim. No. 21-139 (TNM)(2 years probation); *United States v.
Jeffrey Witcher*, Crim. No. 21-235 (RC)(12 months probation); *United States v.
Brandon Nelson* and *Abram Markofski*, Crim. No. 21-344 (JDB) (2 years probation);
*United States v. Thomas Vinson and Lori Vinson*, 21-CR-55 (RBW) (probation with
community service and fine); *United States v. Thomas Gallagher*, 21-Cr-41 (24
months probation); *United States v. Douglas Wangler*, 21-cr365 (DLF) (24 months
probation); *United States v. Bruce Harrison*, 21-cr-365 (DLF) (24 months probation).
And the list could go on as the majority of individuals so charged have received
probation. Indeed, a review of the chart the government compiles showing sentences

to date in the January 6 cases, shows that well over half of the individuals charged with misdemeanors have received no term of incarceration. District of Columbia | Capitol Breach Cases | United States Department of Justice.

### 2. Other January 6th Cases for Consideration

While no two cases or two defendants are exactly alike, the defense has identified the following cases to consider as comparators:

<u>*United States v. Joshua Hall*</u> (23-cr-246-JMC):

Defendant Joshua Hall entered the Capitol building through the same door as Mr. Dula and his wife just two minutes earlier than they did. Hall then traveled in the exact same area of the building and exited through the same door at approximately the same time. *The image below shows Hall exiting just in front of Mr. Dula and Ms. Fontaine.*



Though his timing and route through the building were similar, Hall's specific conduct/behavior was otherwise more egregious than that of Mr. Dula and Ms. Fontaine.  For example, Hall planned for January 6th by searching the internet

for various weapons and riot gear; and then arrived equipped with a gasmask
(which he is seen wearing in the image above).  He also climbed over a railing to get
to the door of the building, and then screamed at officers while inside.[5]  Joshua Hall
was sentenced to 12 months probation with no period of incarceration or home
detention.

*United States v. Ralph Kahler & Suzanne Kahler (23-cr-312-RC; 23-cr-313-RC):*

Defendants Ralph Kahler and Suzanne Kahler are a married couple that
entered the Capitol building through a door on the Northwest terrace just steps
away from where Mr. Dula and Ms. Fontaine entered. Similarly, the Kahlers
remained only in the hallways and did not engage in violence or destruction while
inside. The Kahlers exited the building after only three minutes, but they remained
on the Upper West terrace for 29 minutes afterward.[6]  At that time, law
enforcement had occupied the area by forming a line to hold back the crowds. *Image
below shows the area at 3:09pm (when the Kahlers exited the building) where they
remained for 29min.*



---

[5] Government Sentencing Memorandum, ECF 30
[6] Government Sentencing Memoradum, ECF 24

The Kahlers were each sentenced to 12 months probation with special conditions of 30 days home detention. The government may argue that the Kahlers were only in the building for three minutes. The defense submits that the act of remaining at or near the front lines for 29 minutes afterwards far outweighs this minor difference.

_United States v. Bryan Wayne Ivey_, 21-cr-267 (CRC)

Mr. Ivey pleaded guilty to one count of Parading and Picketing for entering the Capitol building through a smashed window. He was one of the first rioters to enter the building. Mr. Ivey was in the building for 34 minutes, minimized his conduct in his FBI interview, and deleted photos and videos from his cell phone after January 6.[7] The Court rejected the government's request for 14 days incarceration and imposed a sentence of probation, with a condition of 60 days of home detention.

_United States v. Trudy Castle_, 22-cr-261(CRC)

Ms. Castle pleaded guilty to one count of Parading and Picketing for entering through the Senate Wing Door minutes after the first protestors breached the building. Ms. Castle remained in the building for 40 minutes, entering through various locations throughout the building upstairs and downstairs. She took photos inside the building and left only after officers began using tear gas. Later, she removed evidence from her phone.[8] The Court imposed a sentence of 30 months' probation.

---

[7] Government's Sentencing Memo, 1:21CR267, ECF. No. 34.
[8] Government's Sentencing Memo, 1:22CR261(CRC), ECF. No. 41.

_United States v. Zylas Hamilton (24-cr-153-RDM)_

Similar to Mr. Dula and Ms. Fontaine, defendant Zylas Hamilton entered the building through a door on the Northwest terrace, he was non-violent/non-aggressive while inside, he walked through a relatively small portion of the building, he remained inside for a short time (14 minutes) and left Capitol grounds upon exiting the building.  But as with the other cases cited, Hamilton's conduct was otherwise worse than that of Mr. Dula and Ms. Fontaine.  For example, Hamilton arrived early to Capitol grounds - early enough to witness the initial breaches and the violence on the West front; and then stood close to law enforcement at the front lines – close enough that he was hit with non-lethal munitions deployed by officers. He entered the building even after being hit with those munitions which should have been a clear sign that was not allowed to be there. He then boasted about his actions on social media in the days and weeks following January 6th.[9]  Zylas Hamilton was sentenced to 24 months probation with special conditions of 30 days home detention.

_United States v. Xyan Clary & Nico Clary (23-cr-432-RBW)_

Another similarly situation case is that of defendants Xyan and Nico Clary. The Clarys also entered the Capitol building through an entrance on the Northwest terrace, just steps away from where Mr. Dula and Ms. Fontaine entered. They remained inside the building for six minutes and were non-violent while inside. But again, as in other cases noted, the actions and conduct of these defendants were

---

[9] Government Sentencing Memorandum, ECF 29

otherwise worse than those of Mr. Dula and his wife. Most notably, the Clarys climbed Peace Monument (which was clearly surrounded by fencing and "area closed" signs that remained throughout the day) and remained there for 24 minutes; and the Clarys remained on the Northwest terrace following their exit from the building, and only left when they were pushed out by law enforcement at 4:40pm.[10] As noted above, Mr. Dula and Ms. Fontaine were nowhere near the Capitol this late in the day, as they had left over an hour earlier.  And they certainly never climbed on any historical monuments.  This Court sentenced both Xyan Clary and Nico Clary to 36 months probation with no period of incarceration or home detention.

### United States v. Vincent Ardolino (22-cr-406-RBW):

Vincent Ardolino also entered the Capitol building through a door on the Northwest terrace. He remained inside the building for five minutes, which is a shorter duration than that of Mr. Dula and Ms. Fontaine. But unlike Mr. Dula and his wife, Ardolino remained on the Northwest terrace after exiting the building where he filmed a video of law enforcement while calling them traitors and other obscenities.  Ardolino then called for violence following January 6th by posting on social media that it was "time for Trump supporters to get violent."  Furthermore, Ardolino lied to the FBI when he was interviewed a year later, first claiming that he only attended the rally and then only admitting to entering the Capitol after being shown photographs of himself.  Finally, Ardolino had been on probation five times

---

[10] Government Sentencing Memorandums, ECF 52 & ECF 53 ; Statement of Facts, ECF 1

in the past and was on probation on January 6th.[11] This Court sentenced Vincent

Ardolino to 36 months probation with no period of incarceration or home detention.

_United States v. Joseph Zlab (21-cr-389-RBW):_

Defendant Joseph Zlab was also sentenced to probation by this Court,

although aside from the time spent inside the building (13 minutes) his actions at

the U.S. Capitol are not exactly comparable to those of Mr. Dula and Ms. Fontaine,

as they were markedly worse.  Zlab traveled through many areas of the Capitol,

traversing two different floors of the building. He started by walking through the

Crypt (where he recorded video of law enforcement screaming at him and others to

leave – but he did not leave), then went to floor two where he passed through the

Rotunda lobby, the Statuary Hall, the Hall of the House of Representatives, then

carried on to floor three where he briefly entered the House Appropriations Room (a

room considered to be private) before going back to floor two and passing the main

entry of the House Chamber and finally exiting through the East Rotunda doors.

Video recorded by Zlab showed that several of the areas he passed through were

filled with tear gas, law enforcement, and rioting protestors. Furthermore, Zlab has

a prior history of violence and was convicted for "Harrassment-Domestic Violence"

in 2015 for which he served time.  Finally, Zlab has eight years of former military

training, which according to the government "renders his conduct on Jan 6 all the

---

[11] Government Sentencing Memorandum, ECF 33; Transcript of Sentencing, ECF 42

more egregious."[12]  Joseph Zlab was sentenced to 36 months probation with no period of incarceration or home detention.

### United States v. Jesse Watson (23-cr-87-RBW):

Jesse Watson, also sentenced to probation by this Court, is another case in which conduct was worse than that of Mr. Dula and Ms. Fontaine.  First, before entering the building, Watson went to the West front where he stood at the front lines, just a few feet away from MPD for roughly two hours where he most certainly witnessed violence.  When he did go inside the building, Watson attempted to deface property – even after U.S. Capitol Police had stopped him; and according to the government, he filmed and encouraged various acts of disorderly conduct including smoking marijuana, loud chanting, and suggesting that people relieve themselves in the building. After exiting the building, he walked around to the North door where he joined others in attempting to breach that door.  Finally, Watson stayed on Capitol Grounds for over an hour before leaving.[13]  Jesse Watson was sentenced to 36 months probation with no period of incarceration or home detention.

### United States v. Austin Harris (23-cr-155-RBW):

Finally, defendant Austin Harris was also sentenced to probation despite engaging in worse conduct than Mr. Dula and Ms. Fontaine. Harris began by moving to the front lines on the West side and standing directly in front of law enforcement where his confrontation with MPD included physical contact (an action

---

[12] Government Sentencing Memorandum, ECF 43
[13] Government Sentencing Memorandum, ECF 56

which has often resulted in felony charges for other January 6th defendants). Harris then entered the building through a door on the Northwest terrace and remained inside for 41 minutes which is nearly four times longer than Mr. Dula and Ms. Fontaine.  This Court sentenced Austin Harris to 36 months probation with no period of incarceration or home detention.

The government may point to other cases where periods of incarceration have been imposed.  The defense submits that those cases do not justify a sentence of incarceration for Mr. Dula and Ms. Fontaine given their specific conduct, their contrition, their cooperation, and their history and characteristics.

### E.   A sentence of probation and incarceration if imposed would create disparity when compared to similarly situated defendants charged and convicted prior to the *Little* decision.

Mr. Dula entered a guilty plea to the only offer the government tendered, that is, to two petty misdemeanor counts: one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. 5104(e)(2)(G), and one count of Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. 5104(e)(2)(D). Prior to the D.C. Circuit's opinion, *United States. v. Little, 78* F.4th 453 (D.C. Cir. 2023), which held that split sentences cannot be imposed for petty offenses, the government's standard plea offer for defendants similarly situated to Mr. Dula was to a *single count* of Parading and Picketing. Post *Little*, the government has required defendants to plead guilty to two counts. That is because based on the *Little* decision, the government would be unable to request a sentence of both probation and incarceration for a single petty offense.

25

In *Little*, the D.C. Circuit agreed with the defense that a split sentence for a petty offense "conflicts with the statutory scheme" Congress laid out which made probation and imprisonment separate options for separate offenses. *Id*. In so holding, the D.C. Circuit was clear that a sentence of imprisonment and probation would "subvert the Sentencing Reform Act's general rule that probation is a standalone sentence, combinable only with a fine, not with imprisonment." *Id*. at 458.

Despite the D.C. Circuit's clear instruction that this type of sentence was not contemplated by Congress when it created the petty offense framework, the government has sought in many cases an end-run around the holding in *Little*. If the government does so in this case, the Court should reject the government's invitation to impose an enhanced punishment on Mr. Dula not based on his culpability but based on the timing of the government's decision to charge him. This is particularly true, when as here, had the government arrested Mr. Dula when he met with the agents and offered to turn himself in, he would have been offered a single petty misdemeanor plea. Instead, the government waited 16 months. The happenstance of when he was charged should not dictate his sentence.

A review of sentences this Court imposed prior to *Little* in similar cases in which defendants were equally or more culpable than Mr. Dula (as cited above) demonstrates that a sentence of both incarceration and probation would result in disparate treatment.

Moreover, post *Little*, for the vast majority of cases of individuals in Mr. Dula's position, i.e., with 2 petty offenses, Judges have declined to impose two separate punishments for offenses that are virtually identical.[14] *See e.g.*, *United States v. Cameron Campanella*, 23-cr-231 (ACR) (12 months probation on each count, concurrent); *United States v. David Tyner*, 23-cr-361-1 (RDM) (36 months probation with 60 days home detention on both counts, concurrent) *United States v. Christian Tyner*, 23-361-2 (RDM) (24 months probation with 30 days home detention on both counts, concurrent); *United States v. Juan Rodriguez*, 23-cr-270 (ADM) (30 days incarceration on both counts, concurrent; no probation); *United States v. Nhi Ngoc Mai Le*, 23-cr-317 (TSC) (10 days incarceration on both counts, concurrent; no probation); *United States v. Thomas Pooler*, 24-cr-75 (TNM) (12 months probation on each count, concurrent); *United States v. Nicholas Von Keudell*, 23-cr-221 (CRC) (24 months probation on each count, concurrent); *United States v. Steven Hanna,* 23-cr-272 (TJK) (24 months probation with 45 days home detention on each count, concurrent); *United States v. Robert Hanna,* 23-cr-272 (TJK) (24 months probation with 45 days home detention on each count, concurrent); *United States v. David Smither,* 24-cr-15 (JMC) (12 months probation on each count, concurrent); *United States v. Steven Barber,* 23-cr-409 (DLF) (24

---

[14] This section consists of all of the post-*Little* cases with the same two charges of conviction that are included on the government's table "Sentences Imposed in Cases Arising Out of the Events of January 6, 2021, located at https://www.justice.gov/usao-dc/media/1331746/dl?inline as of September 11, 2024, the last date the chart was updated. Because that chart contains errors, Counsel further confirmed the information by checking the judgements issued in each of the cases.

months probation on each count, concurrent); *United States v. Esvetlana Cramer,* 23-cr-414 (DLF) (24 months probation on each count, concurrent); *United States v. Sarah Holmes,* 24-cr-90 (TNM) (12 months probation on each count, concurrent); *United States v. Stephen Ondulich,* 23-cr-242 (APM) (36 months probation with 45 days home detention on each count, concurrent); *United States v. Jason Curl,* 23-cr-253 (JDB) (24 months probation on each count, concurrent); *United States v. Scott O'Brien,* 24-cr-206(TNM) (24 months probation on each count, concurrent); *United States v. Kimberly Sylvester,* 24-cr-102 (JEB) (12 months probation on each count, concurrent); *United States v. Daniel Valdez,* 24-cr-86 (DLF) (36 months probation on each count, concurrent); *United States v. Robert Colello,* 24-cr-59 (JMC) (12 months probation on each count, concurrent); *United States v. Ulises Wilkinson,* 23-cr-282 (JMC) (12 months probation on each count, concurrent); *United States v. Miles Adkins,* 24-cr-273 (TNM) (24 months probation with 12 days intermittent incarceration on each count, concurrent); *United States v. Tonya Bishop*, 23-cr-416 (TJK) (24 months probation on each count, concurrent); *United States v. Timothy Tedesco*, 24-cr-128 (BAH) (36 months probation with 90 days home detention on each count, concurrent); *United States v. Marissa Bowling, 23-cr-425-01 (APM)* (24 months probation, concurrent); *United States v. Dylan, 23-cr-425-02 (APM)* (24 months probation with 30 days home detention on each count, concurrent); *United States v. Curtis Pulaski*, 24-103 (TJK) (24 months probation with 30 days home detention on each count, concurrent); *United States v. Benjamin Heffelfinger*, 24-cr-51 (RC) (24 months probation with 60 days home detention, concurrent); *United*

*States v. Amanda Mongelli,* 23-cr-390-2 (DLF) (24 months probation on each count, concurrent); *United States v. Valerie Rushing,* 24-cr-86-1 (DLF) (24 months probation on each count, concurrent); *United States v. Zylas Hamilton*, 24-cr-153 (RDM) (24 months probation with 30 days home detention on each count, concurrent); *United States v. David Howard*, 24-cr-47 (APM) (24 months probation with 30 days home detention on each count, concurrent); *United States v. Christopher Gutierrez,* 24-cr-184 (LLA) (36 months probation with 60 days home detention on each count, concurrent); *United States v. Robert Dowell,* 24-cr-335 (TNM) (12 months probation on each count, concurrent); *United States v. Giorgi Masmulashvili*, 24-cr-0165 (JMC) (12 months probation on each count, concurrent); *United States v. John Delbridge, Jr.*, 24-cr-148-1 (CJN) (24 months probation on each count, concurrent); *United States v. Johnny Delbridge III*, 24-cr-148-2 (CJN) (24 months probation on each count, concurrent); *United States v. Joshua Borum*, 24-cr-301 (TNM) (24 months probation on each count, concurrent).

There are of course outliers. *See e.g., United States v. Frederic Fiol*, 23-cr-196 (RCL) (45 days incarceration on one count, 24 months probation on second count); *United States v. Cody Tippett*, 23-cr-337 (CRC) (30 days incarceration on one count, 36 months probation on second count); *United States v. Donald Pearston*, 23-cr-454 (JEB) (10 days incarceration on one count and 9 months probation on the second count); *United States v. Joshua Parmenter*, 23-cr-404 (JEB) (5 days incarceration on one count and 12 months probation on the second count); *United States v. Derek Dodder*, 24-cr-74-2 (CJN) (12 months probation on one count, 14 days incarceration

on second count); *United States v. Christopher Keniley* 24-cr-001 (TSC) (10 days incarceration on one count and 12 months probation on the second count); *United States v. Michael Fournier*, 24-cr-81 (JEB) (30 days incarceration on one count and 12 months probation on the second count); *United States v. Leah Green*, 24-160 (TSC) (7 days incarceration on one count and 36 months probation on second count).

In each of the outlier cases, *Fiol, Tippett, Pearston, Dodder, Parmenter, Keniley, Fournier,* and *Green,* it appears the *Little* issue was not addressed as counsel did not raise it in their sentencing memoranda. While it is possible the Court addressed it, there are no transcripts available and it seems unlikely that the Judges would have raised the issue *sua sponte*. Moreover, in several of the outlier cases, (*Pearston*, *Dodder*, *Parmenter*, *Keniley*, and *Green*) the Court imposed a sentence of incarceration that was short enough to have been imposed as a condition of probation for intermittent confinement, thus not violating the spirit of *Little*.

## IV.    Conclusion

For the reasons stated above, Mr. Dula respectfully requests that the Court impose a period of probation along with $500 restitution and if the Court believes necessary, an appropriate condition of community service and/or fine.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

MICHELLE M. PETERSON
Chief Assistant Federal Public
Defender
625 Indiana Avenue, N.W., Suite
550
Washington, D.C.  20004
(202) 208-7500
Shelli_Peterson@fd.org